## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| REID LEVIN<br>1671 Rydalmount Road<br>Cleveland Heights, Ohio 44118<br><br>Plaintiff,<br><br>v.<br><br>THE NORTHEASTERN OHIO TENNIS<br>ASSOCIATION<br>18725 Shelburne Road<br>Shaker Heights, Ohio 44118<br><br>and<br><br>ANNA MACK<br>18725 Shelburne Road<br>Shaker Heights, Ohio 44118<br><br>and<br><br>BRIAN BANAS<br>1567 Janea Court<br>Hudson, Ohio 44236<br><br>and<br><br>RONALD GANDER<br>723 Ardella Road<br>Cuyahoga Falls, Ohio 44223<br><br>and<br><br>JACQUELINE MAYNARD<br>2170 Stonebridge Crossing<br>Stow, Ohio 44224<br><br>and<br><br>DALE HARTWIG<br>4710 Fishcreek Road<br>Stow, Ohio 44224<br><br>Defendants. | CASE NO.:<br><br>JUDGE<br><br><br><br><br><br><br><br><br><br>**COMPLAINT**<br>**Jury Demand Endorsed Hereon** |

For his Complaint, the Plaintiff, Reid Levin, states as follows:

## PARTIES AND VENUE

1.      Plaintiff Reid Levin (hereinafter "Plaintiff" or "Levin") was at all times relevant a resident of Cuyahoga County, Ohio.

2.      Defendant Anna Mack (hereinafter "Mack") was at all relevant times a resident of Cuyahoga County, Ohio. Mack serves as the Executive Director for the Northeastern Ohio Tennis Association (hereinafter "NEOTA").

3.      Defendant Brian Banas (hereinafter "Banas") was at all relevant times a resident of Summit County, Ohio. Banas serves as the Chairperson of the NEOTA Competition Committee.

4.      Defendant Jacqueline Maynard (hereinafter "Maynard") was at all relevant times a resident of Summit County, Ohio. Maynard is a member of the NEOTA Competition Committee.

5.      Defendant Ronald Gander (hereinafter "Gander") was at all relevant times a resident of Summit County, Ohio. Gander is a member of the NEOTA Competition Committee.

6.      Defendant Dale Hartwig (hereinafter "Hartwig") was at all relevant times a resident of Summit County, Ohio. Hartwig was at all relevant times the NEOTA Adult District League Coordinator and during part of the relevant times, interim NEOTA Executive Director.

7.      The NEOTA was at all relevant times a non-profit corporation duly organized and existing under the laws of the State of Ohio, with its principal place of business in Summit County, Ohio. Hartwig, Mack, Banas, Maynard and Gander are principals and agents of NEOTA, and committed all acts and failures to act described herein while in the scope and course of that agency.

8. This Court has jurisdiction over this matter pursuant 28 U.S.C. §§ 1331, 1337, as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

9. Venue is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and under 28 U.S.C. § 1391, because Defendant NEOTA transacts business and is found within this District and a substantial part of the events or omissions giving rise to Levin's claims occurred in this District including the regulation of sanctioning tennis tournaments within northeast Ohio. Additionally, Levin has sustained and will continue to sustain significant damages in this District.

## BACKGROUND

10. Reid Levin is a certified United States Professional Tennis Association (hereinafter "USPTA") instructor. Beginning on or around 2008, Levin began coaching, instructing and directing tennis and corresponding tournaments in northeast Ohio.

11. Levin's tournaments are distinct from the competition in three ways. Specifically, Levin: (i) schedules tennis matches around players school and personal schedules, (ii) allows a full third set to be played for participants that split sets, rather than a 10-point tiebreaker, and (iii) permits participants to register in two age divisions.

12. In his capacity as tournament director, Levin applied for, was granted and hosted "sanctioned" tournaments under the auspices of the United States Tennis Association (USTA).

13. Only by participating in sanctioned USTA tournaments is a player able to accumulate points under the USTA banner. Points earned go towards a player's ranking.

14. A player's USTA ranking is vital to athletic and physical dexterity, college scholarships, personal accomplishment and pride in accomplishments and potential earnings as a tennis instructor, professional or coach.

3

15.     Prior to April 2013, the NEOTA Executive Director, Carol Gander, sanctioned USTA tournaments in northeast Ohio. The Executive Director did so without consulting the Competition Committee.

16.     Sometime on or around May 2013, upon the death of the Executive Director, Ms. Gander, Hartwig became the interim Executive Director for NEOTA.

17.     As interim Executive Director, Hartwig sought direction and approval from the Competition Committee when sanctioning USTA tournaments in northeast Ohio.

18.     The process of the Executive Director seeking direction and approval from the Competition Committee continues until today with the current NEOTA Executive Director, Mack.

19.     Mack joined NEOTA, as Executive Director, on November 6, 2013.

20.     The application process for hosting and directing a USTA sanctioned tournament in northeast Ohio requires NEOTA approval.

21.     To obtain NEOTA approval, a tournament direction must complete the following: attending tournament directors meeting, paying a $53 sanctioning fee, submitting the appropriate application form and ensuring compliance with district and section policies.

22.     At all relevant times, Levin complied with the NEOTA's application process and protocol for sanctioning tournaments in northeast Ohio.

23.     If the NEOTA Executive Director and Competition Committee refuse to sanction a tournament due to a conflict with another tournament scheduled for the same date, a tournament director can appeal the decision to the NEOTA Competition Committee.

24.     At all times relevant, Banas, Gander and Maynard comprised the NEOTA Competition Committee.

25.     The chairperson of the NEOTA Competition Committee is Banas. Banas owns the LaTuchie Tennis Center (hereinafter "LaTuchie") in Stow, Ohio and Mayfield Village Racquet Club (hereinafter "Mayfield Racquet") in Mayfield Village, Ohio.

26.     From all relevant times until closing on May 31, 2014, Levin was employed at One Wellness Sports and Health (hereinafter "One Wellness"). Until closure, Mayfield Racquet was One Wellness' chief competitor for tennis business in northeast Ohio.

27.     Mayfield Racquet and One Wellness were located 6.8 miles apart.

28.     At all relevant times, Levin's chief competitor, Banas, was chairperson of the NEOTA Competition Committee. Banas' associate, Maynard, was at all relevant times a member of the NEOTA Competition Committee and a prominent member of LaTuchie. Together, Banas and Maynard control a majority vote in the three-member NEOTA Competition Committee.

29.     Beginning on or around 2010, Levin organized and directed an annual tennis tournament held around the New Year holiday. Prior to Levin taking over in 2010, this tournament was organized by Brian Smallwood ("Smallwood"), also a tennis professional at One Wellness, who directed the tournament for years.

30.     On or around November 2013, Levin completed the application to host a sanctioned USTA tournament January 3-5, 2014 (hereinafter "New Year's Tournament").

31.     The New Year's Tournament was to include both a boys and girls division, from ages 12 through 18.

32.     Beginning on or around 2010, Levin organized and directed an annual tennis tournament held around the Valentine's holiday. Prior to Levin taking over in 2010, this tournament was organized by Smallwood who has previously directed the tournament.

33.     On or around November 2013, Levin completed the application to host a sanctioned USTA tournament February 14-16, 2014 (hereinafter, "Valentine's Tournament").

34.     The Valentine's Tournament was to be girls-only, from ages 12 through 18.

35.     The New Year's and Valentine's Tournament were scheduled to be played at One Wellness in Eastlake, Ohio.

36.     On or around December 5, 2013, Levin received an email notifying him that the New Year's Tournament would be sanctioned.

37.     On or around December 8, 2013, Levin received an email notifying him that the Valentine's Tournament would not be sanctioned due to a date conflict. Thereafter, Levin appealed this decision to the NEOTA Competition Committee.

38.     On or around December 19, 2013, Levin received an email notifying him that his appeal was unsuccessful and that the Valentine's Tournament date would not be sanctioned. Rather, to be sanctioned, the Valentine's Tournament date would have to be pushed back or forward.

39.     Hartwig, Banas and the NEOTA Competition Committee refused to sanction the Valentine's Tournament on the weekend requested by Levin, February 14-16, 2014, due to a purported conflict with another tournament also being requested on that same date by The Tennis Center at Peak (hereinafter "Peak"). The distance between One Wellness and Peak is 31.6 miles.

40.     In support of NEOTA's rejection, two district policies were referenced. The first was offered initially based on the prohibition of sanctioning more than one tournament in the same age division on the same date.  The second was offered about a month later, after the fact, and clearly pretextually. It was based on the rule that tournaments scheduled on the same weekend, ought to be at least 50 miles apart and/or 45 minutes driving between facilities.

41.     These purported policies are in direct contravention of NEOTA's ruling only two weeks earlier when NEOTA approved Levin's New Year's Tournament. They also constitute an illegal restraint of trade and infringement on the entire northeast Ohio tennis market. NEOTA

dominates, has complete control of and has a monopolistic grip on boys and girls tennis tournaments in northeast Ohio.

42.     Levin's New Year's Tournament was sanctioned even though it was held on the same weekend as another tournament, with the same age and gender division, directed by Banas at LaTuchie. The distance between One Wellness and LaTuchie is 38.3 miles.

43.     Dissatisfied by this inconsistent ruling, especially since the NEOTA Competition Committee had just sanctioned Levin's New Year's Tournament on the same day as Banas' tournament, Levin was stunned by the pretextual ruling of the NEOTA Competition Committee.

44.     The NEOTA's reason for refusing to sanction Levin's Valentine's Tournament was that Peak held a tournament that same weekend in 2013, and, due to precedence, that weekend was reserved for Peak's tournament.

45.     Unfortunately, the NEOTA Competition Committee failed to recognize, despite being provided clear evidence, that, except for 2013, Levin's Valentine's Day tournament was always closer to Valentine's Day when compared to Peak's Valentine's Day tournament.

46.     Compounding the issue of Mack's, Banas', Hartwig's and the NEOTA Competition Committee's refusal to allow both Levin's Valentine's Tournament and Peak's to be held on the same day was that NEOTA sanctioned three tournaments all on the same day, with the same age and gender divisions. These three tournaments were held in Lorain, Lexington and Pepper Pike, Ohio, February 28 through March 2, 2014.  This was only weeks after it refused to sanction Levin's Valentine's Tournament.

47.     This is an inconsistent application of NEOTA's own policy. It also constitutes an illegal restraint on trade and infringement on the northeast Ohio tennis market. NEOTA dominates, has complete control of and has a monopolistic grip on boys and girls tennis tournaments in northeast Ohio.

48.     On or around November 2014, Levin requested to hold another New Year's Tournament in 2015 (hereinafter "New Year's Tournament 2.0").  Like the previous year, Levin's New Year's Tournament 2.0 was to include both a boys and a girls division. Mack and the Competition Committee refused to sanction either division.

49.     After a lengthy delay in making their decision, Mack and the Competition Committee cited Banas' competing girls tournament, the same weekend, for their refusal to sanction Levin's New Year's Tournament 2.0.

50.     Meanwhile, in order to get his boys New Year's Tournament 2.0 sanctioned, Levin was required to submit a separate application.

51.     As a result of Mack's and the NEOTA Competition Committee's delay, Levin's boys New Year's Tournament 2.0 was only sanctioned two weeks before the tournament date of January 2-4, 2015.

52.     Mack's and the NEOTA Competition Committee's refusal to sanction Levin's New Year's 2.0 Tournament was without basis.

53.     Just ten months earlier, Mack and the NEOTA Competition Committee refused to sanction Levin's Valentine's Tournament. In refusing Levin's Valentine's Tournament, Mack and the NEOTA Competition Committee referenced a policy of sanctioning tournaments based on date precedence.

54.     That is, when refusing to sanction Levin's Valentine's Tournament, one that he organized and directed for several years, Mack and the Competition Committee cited the flawed fact, that, as Peak's 2013 tournament was closest to Valentine's Day, district policy mandated tournament date precedence.

55.     Using this flawed reasoning, one discovers a startling truth: Levin's New Year's Tournament was successfully held in 2014. Meanwhile, Banas' did not direct a boys or girls

8

tournament the weekend of January 3-5, 2014, as his girls tournament was canceled at the eleventh hour.

56.     Applying the same rationale provided for refusing to sanction the Valentine's Tournament, Levin's New Year's Tournament 2.0 for the girls ought to have been sanctioned and not Banas' tournament.

57.     Levin's New Year's Tournament 2.0 for girls was not sanctioned. Rather, Mack and the Competition Committee only sanctioned the boys division.

58.     Levin was not afforded an opportunity to appeal Mack's and the Competition Committee's unjust, improper and inconsistent refusal to sanction his girls New Year's Tournament 2.0.

59.     The inability to appeal Mack's and the Competition Committee's refusal to sanction his girls New Year's Tournament 2.0, even though tournament precedence ought to have resulted in his tournament being sanctioned, directly harmed Levin. Similarly, it harmed players by reducing the number of tennis tournaments available in northeast Ohio that weekend.

60.     Compounding the issue of inconsistent formulation and application of district sanctioning policies, NEOTA and its Competition Committee, has and continues to sanction NEOTA tournaments on the same day as USTA Midwest tournaments held in northeast Ohio. This is often in direct contravention of NEOTA's prohibition on sanctioning tournaments within 50 miles of each other and/or 45 minutes driving time between facilities, and, always in contravention of NEOTA's prohibition on sanctioning more than one tournament, in the same age division, on any given date, throughout northeast Ohio.

61.     The purported policies of NEOTA and its Competition Committee are inconsistent and indicate tortious interference, multiple violations of the Sherman Antitrust Act and constituting unfair restraint on trade.

9

62.     The NEOTA policies suffers from the following infirm:

    a.      Constitutes illegal practice;

    b.      Applied haphazardly, often to the advantage of favored tournaments and tournament directors; and,

    c.      It is routinely disregarded when there are Midwest tournaments.

63.     Taken together, the rule is inconsistent at best, and often, pre-textual at worst.

64.     NEOTA dominates, has complete control of and has a monopolistic grip on boys and girls tennis tournaments in northeast Ohio.

65.     Even if the NEOTA and its Competition Committee applied the purported rules consistently, those rules qualify as an illegal restraint of trade under the Sherman Antitrust Act.

66.     The NEOTA and its Competition Committee have inconsistently, arbitrarily and capriciously formulated district policies and done so in derogation of Ohio and Federal law.

67.     Plaintiff's injury is of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

**First Cause of Action: Violation of Sherman Antitrust Act (15 U.S.C. §§ 1–7, 12- 27)**

68.     Levin adopts and reasserts the allegations contained in paragraphs 1 through 67.

69.     The NEOTA and its Competition Committee have formed a contract, combination or conspiracy to regulate the process of approving sanctioned USTA tournaments.

70.     The conduct of the NEOTA and its Competition Committee herein described has a substantial impact on the northeast Ohio tennis tournament market, including all submarkets such as tennis development and training.

71.     The failure of the NEOTA and its Competition Committee to recognize and account for the intrinsic uncertainty inherent in its application process constitutes an unreasonable restraint of trade in the northeast Ohio tennis tournament market because:

a. It significantly reduces the number of USTA sanctioned tournaments available to players in northeast Ohio. In Levin's case, his tournaments are hosted and played on clay courts, therefore, by refusing to sanction his tournaments, northeast Ohio tennis players have reduced choices of playing surfaces. Moreover, Levin's tournaments are played in Perry, Ohio, thereby reaching participants from eastern Ohio, neighboring western Pennsylvania and New York.;

b. It unnecessarily increases the cost of USTA sanctioned tournaments for participants due to the decreased number of tournaments available;

c. It unnecessarily increases a tennis director's risk of substantial economic loss as a result of erroneous rejection and/or refusal to sanction USTA tournaments in northeast Ohio; and,

d. It significantly increases the risks of tennis facilities closing due to a lack of available tournaments to be hosted.

72. The consequences described above impact all tennis players participating in northeast Ohio and from neighboring states, such as Pennsylvania, New York, Indiana and West Virginia. The unnecessary increase in costs and available options will reduce the number of tournament directors and reduce the introduction of new tennis tournaments.

73. Further, the unnecessary increases in costs and lack of options will have a disproportionate impact on smaller tennis facilities and junior tournament directors that do not have the resources to absorb the additional costs or to risk substantial economic loss. This will force smaller tennis facilities and junior tournament directors out of the market and reduce the overall availability of tennis tournaments.

74. The loss of smaller tennis facilities and junior tournament directors will negatively impact consumers, teams, coaches, players, retailers and the overall health of the game in northeast Ohio.

75. The refusal of the NEOTA and its Competition Committee to acknowledge and account for the intrinsic uncertainty in the process and/or application of sanctioning USTA tournaments does not have any pro-competitive effects. Although the NEOTA tournament

sanctioning policy, one not consistently applied, is to refuse sanctioning more than one tournament in northeast Ohio, the extremely small value of the NEOTA's intrinsic uncertainty do not result in any measurable change in safety or tennis performance.

76.     The conduct of the NEOTA and its Competition Committee constitutes a combination or conspiracy exercising substantial control over the northeast Ohio tennis tournaments and unreasonably restricts market competition in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

77.     Even if the NEOTA and its Competition Committee were to apply district and section rules consistently, those rules are illegal under the Sherman Antitrust Act, 15 U.S.C. §1.

78.     The NEOTA exercises monopolistic control over the approval, certification and sanctioning of USTA tournaments in northeast Ohio.

79.     The monopolistic control gives the NEOTA the effective power to exclude current and potential tennis tournament directors including Levin from the northeast Ohio tennis market.

80.     By failing to acknowledge and account for the intrinsic uncertainty of the NEOTA sanctioning process, the NEOTA has wrongfully used the lax oversight certification protocol to exclude Levin from the northeast Ohio tennis tournament market in violation of 15 U.S.C. § 2.

### Second Cause of Action: Ohio Monopoly Claim

81.     Levin adopts and reasserts its allegations contained in paragraphs 1 through 80.

82.     As described in prior paragraphs, the NEOTA and its Competition Committee have formed a combination, contract or conspiracy as those terms are utilized in Ohio Revised Code 1331.

83.     The combination, contract, or conspiracy has a significant impact on the northeast Ohio tennis market for gaining USTA points, including all submarkets such as viability of tennis facilities, training programs and tournament calendar.

84.     The failure of the NEOTA and its Competition Committee to recognize for the intrinsic uncertainty inherent in their district and section policies when reviewing USTA tournament applications constitutes an unreasonable restraint of trade in the Ohio USTA tennis tournament market because:

a.     It significantly reduces the number of USTA sanctioned tournaments available to players in northeast Ohio. In Levin's case, his tournaments are hosted and played on clay courts, therefore, by refusing to sanction his tournaments, northeast Ohio tennis players have reduced choices of playing surfaces. Moreover, Levin's tournaments are played in Perry, Ohio, thereby reaching participants from eastern Ohio, neighboring western Pennsylvania and New York.;

b.     It unnecessarily increases the cost of USTA sanctioned tournaments for participants due to the decreased number of tournaments available;

c.     It unnecessarily increases a tennis director's risk of substantial economic loss as a result of erroneous rejection and/or refusal to sanction USTA tournaments in northeast Ohio; and,

d.     It significantly increases the risks of tennis facilities closing due to a lack of available tournaments to be hosted.

85.     The consequences described above impact all USTA tournament directors participating in the Ohio market.

86.     The unnecessary increases in costs and lack of options will have a disproportionate impact on smaller tennis facilities and junior tournament directors that do not have the resources to absorb the additional costs or to risk substantial economic loss. This will force smaller tennis facilities and junior tournament directors out of the market and reduce the overall availability of tennis tournaments.

87.     The conduct of the NEOTA and its Competition Committee constitutes a combination or conspiracy exercising substantial control over the USTA tennis tournaments unreasonably restricts market competition in violation of Ohio Revised Code § 1331.

### Third Cause of Action: Tortious Misconduct and Interference

88.     Levin adopts and reasserts the allegations contained in paragraphs 1 through 87.

89.     The conduct described above constitutes intentional, or alternatively, negligent tortious conduct and caused and continues to cause injury and damage to Levin in the form of economic loss, damage to reputation, and diminished business valuation. Meanwhile, the conduct described above caused and continues to cause injury to tennis players in Ohio and throughout the United States.

90.     When his Valentine's Tournament was not sanctioned, Levin appealed to the NEOTA Competition Committee.

91.     In his appeal, Levin presented uncontradicted evidence that, except for 2013, Levin's Valentine's Day tournament was always closer to Valentine's Day when compared to Peak's Valentine's Day tournament.  Therefore, that weekend, February 14-16, 2014, belonged to him to host his tournament.

92.     Despite this uncontradicted evidence, the Competition Committee continued to apply the inconsistently formulated policy that no two tournaments, with the same divisions, can be held on the same day.

93.     Not only is this a restraint of trade, the NEOTA and its Competition Committee knew or should have known that their conduct would cause an interference in Levin's business relationships with players, sponsors and athletic programs.

94.     What makes this tortious interference more egregious, is that a competitor of Levin, Banas, chairs the Competition Committee.

14

95.     Banas has consistently failed to recuse himself from hearing Levin's appeals pertaining to the sanctioning of USTA tournaments in northeast Ohio.

96.     Banas had, and continues to have, a financial motive to reject Levin's applications to direct USTA tournaments.

97.     Thus, rather than take advantage of the business opportunities that competitors seek to offer, Banas and NEOTA irrationally engage in anti-competitive conduct and quash those opportunities in favor of Levin.

98.     The application of the NEOTA policy in refusing to sanction Levin's tournaments on multiple occasions without accounting for the intrinsic uncertainty of their policy constitutes wanton and malicious conduct resulting in an intentional interference with Levin's business relations.

99.     As a result of the misconduct of the NEOTA and its Competition Committee described herein, Levin has sustained and will continue to sustain economic losses including but not limited to:

        a.      Lost past, present and future profits;

        b.      Lost business opportunities;

        c.      Lost market share;

        d.      Impairment of business relations;

        e.      Loss of business reputation;

        f.      Costs of litigation;

        g.      Treble damages; and,

        h.      Attorneys' fees.

100.    Levin is entitled to and requests a trial by jury for all issues.

WHEREFORE, Levin prays that after due proceedings:

1.  That there be a monetary award in favor of Levin and against the NEOTA and its Competition Committee for all past, present and future economic losses sustained by Levin as a result of the conduct of the NEOTA and its Competition Committee, as well as punitive damages.

2.  That there be an award of treble damages pursuant to 15 U.S.C. § 15;

3.  That Levin be awarded all attorneys' fees, expert witness fees and costs; and,

4.  That the Court award other relief as justice requires.

Respectfully submitted,

 /s/Mark Mikhaiel
Joel Levin              (0010671)
Aparesh Paul        (0077119)
Mark M. Mikhaiel     (0091656)
Attorneys for Plaintiffs
LEVIN & ASSOCIATES CO., L.P.A.
The Tower at Erieview, Suite 1100
1301 East 9th Street
Cleveland, Ohio 44114
Tel: (216) 928-0600
Fax: (216) 928-0016
jl@levinandassociates.com
ap@levinandassociates.com
mm@levinandassociates.com

*Attorneys for Plaintiff, Reid Levin*

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all the issues so triable.

 s/ Mark M. Mikhaiel
Mark M. Mikhaiel      (0091656)
One of the Attorneys for Plaintiff

16